UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEBERT THOMAS,<br>　　　　Plaintiff | : | CIVIL ACTION NO. 3:02CV457 (MRK) |
| v. | : | |
| THE METROPOLITAN DISTRICT<br>COMMISSION,<br>　　　　Defendant | : | DECEMBER 11, 2003 |

**PLAINTIFF'S OBJECTION TO MOTION FOR SUMMARY JUDGMENT**

The Plaintiff, Lebert Thomas, respectfully submits the following memorandum in opposition to the Defendant, Metropolitan District Commission's ("MDC"), Motion for Summary Judgment. The Plaintiff asserts that there remain genuine issues of material fact which are not appropriate to be resolved by summary judgment and that the legal arguments made by the Defendant are unsound. Therefore, the Plaintiff asks that the Court deny the Defendant's motion.

**I.   STANDARD OF REVIEW**

"[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). At summary judgment, the non-moving party's version of any disputed issue of fact is presumed correct. Eastman Kodak Co. v. Image Technical Services, Inc., 504 U.S. 451, 456, 112 S. Ct. 2072, 119 L. Ed. 2d 265 (1992); see also Mandell v. County of Suffolk, 316 F.3d 368, 374 (2d Cir. 2003). In considering a motion for summary judgment, "the trial court

must first resolve all ambiguities and draw all inferences in favor of the non-moving party, and then determine whether a rational jury could find for that party." Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). "The trial court's function at this stage is to identify issues to be tried, not decide them. Summary judgment is sparingly used where intent and state of mind are at issue, ... because, as we have emphasized, careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination ...." (Citations omitted.) Id.; see also Mandell v. County of Suffolk, supra, 316 F.3d 377.[1]

## II.   TITLE VII IS NOT EXCLUSIVE REMEDY

The Defendant argues that, to the extent there is an identity between the Plaintiff's claims pursuant to 42 U.S.C. §§ 1981 and 1983 and Plaintiff's claims pursuant to Title VII, the Title VII claims foreclose all other claims.[2] The Defendant cites Gaynor v. Martin, 77 F. Supp. 2d 272 (D.Conn. 1999), in support of this proposition. The District Court's dicta in Gaynor v. Martin, supra, however, does not provide the final word on this issue.[3] In fact, it is clear that a

---

[1] The language from the Second Circuit Court of Appeals' decision in Mandell is nearly identical to that from Graham, the Mandell decision stating "In discrimination cases where state of mind is at issue, we affirm a grant of summary judgment in favor of an employer sparingly because careful scrutiny of the factual allegations may reveal circumstantial evidence to support the required inference of discrimination." (Internal quotation marks omitted.) Mandell v. County of Suffolk, supra, 316 F.3d 377.

[2] The Defendant's argument in this regard as to the § 1981 claim goes no further than the initial argument as to the § 1983 claim. In fact, the Defendant clearly has copied the language from its earlier argument, neglecting in the process to change the language which argues that "to the extent there is an identity between the Plaintiff's Section 1983 claim and her Title VII claim, the Section 1983 is foreclosed." (Defendant's Memo., p. 12). The Defendant's error in this portion of its argument is clearly typographical. The Court should note, however, that the Defendant has failed to provide independent authority for the proposition that a § 1981 claim is foreclosed by a concurrent Title VII claim.

[3] In Gaynor v. Martin, 77 F. Supp. 2d 272, 280 (D. Conn. 1999), the District Court did not actually apply the principal upon which the Defendant attempts to rely. "To the extent there is an identity between plaintiff's section 1983 claim and his Title VII claim, the section 1983 claim would be foreclosed.... If,

plaintiff may bring a claim against an employer under both Title VII and other applicable state and federal statutes. See Alexander v. Gardner-Denver Co., 415 U.S. 36, 48-49, 94 S. Ct. 1011, 39 L. Ed. 2d 147 (1974) ("Title VII was designed to supplement, rather than supplant, existing laws and institutions relating to employment discrimination."). "[I]t has been assumed in this Circuit that a § 1983 claim is not precluded by a concurrent Title VII claim, when the former is based on substantive rights distinct from Title VII.... A plaintiff cannot use Section 1983 to gain perceived advantages not available to a Title VII claimant, ... but a plaintiff can assert a claim under Section 1983 if some law other than Title VII is the source of the right alleged to have been denied." (Citations omitted; internal quotation marks omitted.) Saulpaugh v. Monroe Community Hosp., 4 F.3d 134, 143 (2d Cir. 1993), cert. denied, 510 U.S. 1164, 114 S. Ct. 1189, 127 L. Ed. 2d 539 (1994); see also Goss v. Revlon, Inc., 548 F.2d 405, 407 (2d Cir. 1976) ("[a]lthough parallel to Title VII, and directed in part at the same illegal practices, § 1981 was not preempted by Title VII, but continues in full force and effect").

In the present case, the Plaintiff is seeking relief under several legal theories based upon the Defendant employer's racially discriminatory conduct towards himself and other minority employees as well as the employer's retaliation for the Plaintiff's testimony in a separate discrimination case. "[A] public sector employee may assert claims of racially discriminatory employment practices under both Title VII and section 1983, because the Constitution provides a right independent of Title VII to be free from race discrimination by a public employer."

---

however, plaintiff is basing his claim on a substantive right distinct from Title VII, his claim would not be precluded.... However, because his section 1983 claim must be dismissed for other reasons discussed below, we need not decide this issue." (Citations omitted.) Id.

Southard v. Texas Bd. Of Criminal Justice, 114 F.3d 539, 549-50 (5th Cir. 1997); see also Bradley v. Pittsburgh Bd. Of Educ., 913 F.2d 1064, 1079 (3d Cir. 1990) ("the comprehensive scheme provided in Title VII does not preempt section 1983, and … discrimination claims may be brought under either statute, or both"); Roberts v. College of the Desert, 870 F.2d 1411, 1415 (9th Cir. 1988) ("[w]e agree with the reasoning of those courts that have held that Title VII does not preempt an action under section 1983 for a violation of the fourteenth amendment"); Brown v. Hartshorne Pub. School Dist. No. 1, 864 F.2d 680, 683 (10th Cir. 1988) ("Courts of Appeals addressing the issue have held that causes of action exist under both section 1983 and Title VII for public sector employment discrimination"); Trigg v. Fort Wayne Community Schools, 766 F.2d 299, 302 (7th Cir. 1985) ("the Fourteenth Amendment and Title VII have granted public sector employees independent rights to be free of employment discrimination").

The Defendant's argument fails to acknowledge that the Plaintiff seeks to vindicate his rights under both Title VII and the Constitution. Therefore, summary judgment is not appropriate.

### III.   GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO WHETHER ADVERSE TREATMENT OF PLAINTIFF WAS BASED UPON RACE OR RETALIATION

The Defendant argues that the litany of inappropriate actions undertaken by the management of the MDC towards the Plaintiff should not be perceived as proving a claim of discrimination based upon race or retaliation. The Defendant's arguments in this regard amount to nothing more than its interpretation of the facts of this case. The Defendant does not

merely set forth the facts of the case; the Defendant's memorandum makes factual arguments as to what inferences should be drawn from some of the evidence presented. The Plaintiff, on the other hand, would ask a jury to draw a different set of inferences from the evidence presented. Rather than have the Court determine which inference is proper on summary judgment, however, this case should be submitted to a jury. See generally Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000) ("The trial court's function at this stage is to identify issues to be tried, not decide them.").

The Plaintiff asks the Court to consider the historical context of the Defendant's conduct that existed both before and after the present claims were filed. The Defendant commissioned the law firm of Levy & Droney, P.C. to conduct a compliance audit of its employment practices.[4] The Levy & Droney report, dated March 15, 2002 describes an organization, which has neglected its obligations to female and minority employees and has suffered from a continuing lack of competent leadership to remedy problems with discrimination for an extended period of time. The report notes that "very fundamental policies, programs and documents which govern the employment practices of most employers were not in place and/or were not being utilized by the MDC." (Exhibit A, p. 8).

"We heard complaints that minorities who apply for entry level positions routinely are placed in the treatment plant. This may be because of education levels and experience. Our investigation revealed, however, that qualified minorities did not achieve supervisor status for

---

[4]The report generated as a result of this compliance audit is described as the "Levy & Droney report" and, occasionally, the "Tarlow & Levy" report in depositions. A true and accurate copy of the pertinent excerpts of this report are attached hereto as Exhibit A.

many years. There is only one Black male in what the MDC describes as its 'administrative/management positions'. He replaced a 'Director', but he is only a Manager. Of the two White females at that level, one is in an 'Acting' position and the other, who replaced a 'Director', is also only a 'Manager'. There are no Hispanics or Asians represented in MDC's administrative/management level positions. Several of the Operations departments include no women at all." (Exhibit A, p. 12).

"It is fair to say that MDC management over time since 1929 can be characterized as an 'old boy' network, featuring almost exclusively white males who have succeeded one another, stayed with the organization during most of their adult, productive lives and hired and promoted persons who look like them. Hiring by word-of-mouth to or from MDC Board members or administrators has long been the practice at the MDC. The current CEO was hired from outside. The current CAO also came from the outside." (Exhibit A, p. 19).

"Also absent from the MDC's policy documentation is an updated Affirmative Action Plan. The first MDC Affirmative Action Plan we were able to locate is dated 1996. The MDC has not sought to review or update its Affirmative Action Plan since 1997. It further has not utilized Affirmative Action goals in reviewing hiring and/or promotional practices. Other than having an outdated policy, the District has done little to ensure Affirmative Action goals are in keeping with the organization's legal obligations. Recall the MDC is, for purposes of the law a 'municipality'. This is significant. An Affirmative Action Policy, updated and correct, which includes the goals for the corporation provides a benchmark for reviewing hiring, retention and promotion practices of protected classes." (Exhibit A, pp. 28-29). The report's reference to

the Defendant's affirmative action legal obligations is further borne out by the fact that the Defendant receives millions of dollars in federal grants every year.[5]

Moving on to the Defendant's treatment of the Plaintiff, in particular, the Defendant recognizes that the following actions occurred in the course of the Plaintiff's employment: "as a result of [the Plaintiff's] testimony [in Harper vs. MDC], he was subject to adverse treatment by several employees of the MDC.... Management initiated changes including: a. Sitting in on interviews Plaintiff conducted;  b. Overriding action Plaintiff took in regard to certain projects;  c. Holding meetings which Plaintiff was not invited to;  d. Overriding his decision concerning placement of personnel;  e. Reassigning work to other employees;  f. Excluding Plaintiff from meetings when he was previously involved in those matters; and  g. Calling Plaintiff the day of the jury verdict in Harper vs. MDC.... The Plaintiff attended a meeting where Cornelius Geldof, screamed at the Plaintiff, pointed his finger in plaintiff's face, and tore up papers.... After raising ... complaints, the Plaintiff was confronted [by] Geldof accompanied by the Chairman of the Metropolitan District Commission Gallicchio. At this meeting Geldof stated that Plaintiff was saying `bad things about him', and that he should not be saying these things. Geldof also introduced Gallicchio to the Plaintiff.... The Plaintiff was not reclassified in his position, despite the addition of several large functions and responsibilities." (Defendant's Rule 9 (c) 1 Statement, pp. 2-3).[6] The Plaintiff will address

---

[5]True and accurate copies of the relevant portions of the Defendant's Comprehensive Annual Financial Reports for the years 1998 through 2002 are attached hereto as Exhibits B through F.

[6]The Court should note that paragraph 14 of the Defendant's Rule 9 (c) 1 Statement asserts "The Plaintiff's supervisors have recommended an upgrade in his salary from EE-16 to EE-18. This

each of these items and demonstrate that the facts are not as undisputed as the Defendant's memorandum would lead one to believe.

First, as to the Defendant having other people sit in on the interviews that the Plaintiff conducted, Bob Moore directed Richard Newton to do so. (Richard Newton deposition, attached hereto as Exhibit J, p. 68). According to Mr. Newton, Mr. Moore did not explain the reasons behind this unusual request. (Exhibit J, pp. 68, 73). These actions took place shortly after the Plaintiff's testimony in Harper v. MDC. (Lebert Thomas affidavit, attached hereto as Exhibit G, ¶ 6). Moore also did not explain the reasons for Newton's presence at the interviews to the Plaintiff, nor did the Plaintiff ask for any assistance with the interviews. (Exhibit G, ¶ 7).

As to the fact that the Defendant retaliated against the Plaintiff by overriding his decisions concerning the placement of personnel, Mr. Geldof has admitted that this occurred and he could not recall any similar instances involving other employees. (Cornelius Geldof deposition, attached hereto as Exhibit K, pp. 149-51). Mr. Newton agreed that the Plaintiff had the responsibility to assign seating and office space within his unit. (Exhibit J, pp. 28-29). When Mr. Geldof overruled the Plaintiff's decision to give Daisy Chavez a cubicle in which she could work, Mr. Newton stated Geldof's decision did not make any sense, that the

---

recommendation is pending at this time. Zaik at 5." These factual allegations are wholly unsupported by the affidavit of Robert J. Zaik. Furthermore, this unsupported allegation does nothing more than demonstrate the Defendant's agreement that the Plaintiff is not being paid an amount appropriate for the level of work he currently is performing.

The Defendant has also erred in asserting in paragraph 16 that "Plaintiff filed a discrimination complaint in November, 2001, which was resolved. Zaik at 6." In fact, Mr. Zaik asserts that the Plaintiff filed a discrimination claim on November 5, 1991.

placement of people is up to the person who manages them. (Exhibit J, pp. 80-81).

As an example of the Defendant reassigning work to other employees, the Defendant assigned Steve Paul to coordinate the Water Distribution Modeling Project. (Exhibit J, p. 45). This was a project that the Plaintiff, as the manager of engineering services, would normally coordinate. (Exhibit J, p. 46). This project was reassigned to be coordinated by Mr. Paul, who had no background in engineering and no knowledge of water distribution. (Exhibit J, pp. 40-41; Jennifer Ottalagana deposition, attached hereto as Exhibit L, pp. 18-19). This same Mr. Paul was the manager of the computer services group during whose tenure there was a loss of between $14 million and $17 million. (Exhibit J, p. 41). Therefore, it is a reasonable inference that the Plaintiff's authority was deliberately undermined not to put a better qualified person in charge of this project, but rather for other, retaliatory or discriminatory reasons on the Defendant's part.

As to the requested reclassification of Plaintiff's position, Mr. Geldof agreed during his deposition that he was aware that the Plaintiff had sought reclassification of his position and that that was something that reasonably should have done by the Defendant. (Exhibit K, pp. 140-41). When the Plaintiff had requested reclassification, however, Mr. Geldof told the Plaintiff that he would throw his request in the garbage. (Exhibit L, pp. 58-59; Exhibit G, ¶ 12). Robert Zaik, in his deposition, described the reclassification process, and it is clear that Mr. Geldof's actions in failing to sign the Plaintiff's reclassification request was improper according to the Defendant's standard procedures. (Robert Zaik deposition, attached hereto Exhibit M, pp. 78-82). All that Mr. Geldof had to do was to sign the Plaintiff's request for

reclassification review, whether he agreed that the Plaintiff's position should be reclassified or not. Rather than allow for even the possibility that the Plaintiff's position would be reclassified, Mr. Geldof placed an obstacle in his way. These improper actions of Mr. Geldof are interwoven with the Defendant's current agency-wide classification review, inasmuch as the Plaintiff would not be awarded retroactive pay to the time of his reclassification request as other employees would be. (Robert Moore deposition, attached hereto as Exhibit N, pp. 199-202).

The Court should also be aware that the management of the Defendant did not simply call the Plaintiff on the day of the jury verdict in Harper v. MDC; the Plaintiff was called by one of his supervisors, who was at that point calling from a cell phone on a golf course, and told not to incite trouble. (Exhibit G, ¶ 5).

The testimony of Robert Zaik supports an inference that the Defendant has a policy of retaliating against employees who file complaints or support others who have done so. (Exhibit M, pp. 122-25). Zaik states that there appears to be a connection between his participation in the company-wide review of employee's complaints of discrimination (the Levy & Droney report) and a subsequent negative performance review.

Furthermore, the sterile manner in which the Defendant describes the actions of Mr. Geldof makes the incident sound like mere acts of rudeness. In fact, Geldof threatened, intimidated and humiliated the Plaintiff by his actions. Persons who were present at that meeting stated that Geldof behaved in an intimidating and threatening manner. (Exhibit J, p. 55; Exhibit L, pp. 25-27). In the meeting at the MDC, Geldof jumped from his seat, charged

over to the Plaintiff who was seated two places from Geldof, and screamed and yelled ferociously in the Plaintiff's face, while violently pointing and waving his finger and fist in the Plaintiff's face. Geldof tore up the working papers while continuing to scream at the Plaintiff. Geldof's face was red, his mouth was foaming and the veins in his neck bulging. Geldof acted in such a way that the Plaintiff believed that he would need to protect himself from physical harm by Geldof. [7] (Exhibit G, ¶ 10). In his deposition, Mr Zaik confirmed that the Plaintiff's description of Geldof's actions was borne out by other persons who were also there. (Exhibit M, pp. 113-15). Mr. Zaik also agreed that Geldof's actions were extreme and outrageous, and "totally uncalled for." (Exhibit M, pp. 147-48). Mr. Newton stated that Geldof would never have yelled at him like that. (Exhibit J, p. 56). As to the apology by Mr. Geldof that the Defendant refers to in its memorandum (Defendant's Memo., p. 10), those present at the time did not believe that this apology was genuine. (Exhibit J, p 58; Exhibit L, pp. 31-32). In fact, there may not have been any actual apology made by Mr. Geldof, but only his statement that he had been told to apologize.[8] (Exhibit L, p. 32).

The Defendant mentions a similar incident between Mr. Geldof and Jennifer

---

[7] The Defendant describes Geldof's actions: "Mr. Geldof had some difficulty with his conduct in the work place...." (Defendant's Memo., p. 11). Apparently, the Defendant believes that Geldof's actions did not contribute to a hostile work environment that was "physically threatening or humiliating." See Harris v. Forklift Systems, Inc., 510 U.S. 17, 23, 114 S. Ct. 367, 126 L. Ed. 2d 295 (1993). The Defendant's denial of the extremely inappropriate nature of Geldof's actions and its attempt to downplay those actions only serve to support the Plaintiff's claims in the present action.

[8] In paragraph 9 of the Affidavit of Robert E. Moore attached to the Defendant's Motion for Summary Judgment, Mr. Moore asserts that a written reprimand was given to Mr. Geldof. If such a paper exists, the Defendant has not complied with the rules of civil procedure, which require attaching a copy of it to the affidavit. Fed. R. Civ. Proc. 56 (e) ("Sworn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith.").

Ottalagana, one of the Plaintiff's subordinates. (Defendant's Memo., pp. 10-11). The Defendant mentions the fact that Miss Ottolagana is a white female, but neglects to mention that Mr. Geldof confronted her about an assignment to an engineer, Deric Downer, in which Mr. Downer was waiting for a response from Jack Proulx, a person in another department at the MDC. (Exhibit L, pp. 38-39). Mr. Downer had performed his duties in a timely manner, but Mr. Proulx had not done his part to respond, nor were Mr. Proulx' actions something that were within Miss Ottalagana's control. (Exhibit L, pp. 39-40). Nevertheless, Mr. Geldof threatened to fire Mr. Downer, who was an African-American employee, rather than Mr. Proulx whose negligence was causing the delay. (Exhibit L, pp. 45-46, 64). It is reasonable to infer that Mr. Downer's and the Plaintiff's race were the underlying causes of Mr. Geldof's outbursts. Any argument by the Defendant to the contrary, that the Court should find that there is no genuine issue of material fact in this regard, ignores the Court's duty to view all inferences in the light most favorable to the non-moving party, the Plaintiff.

When the Plaintiff complained to the head of Human Resources, Geldof again confronted the Plaintiff in a threatening manner, only this time accompanied by Mr. Gallicchio, then Chairman of the MDC. (Exhibit G, ¶ 11). The Defendant's memorandum contains an unsupported factual claim that the confrontation between the Plaintiff and Mr. Geldof, accompanied by Mr. Gallicchio was merely a "chance meeting" in which "Mr. Gallicchio was being shown the recent renovations that were done to the work area in the Engineering and Planning Department." (Defendant's Memo., p. 11). If the Defendant truly believes there is no genuine issue of material fact as to the purpose of Mr. Gallicchio's visit to the Plaintiff's

work area, the Defendant should make an effort to provide evidentiary support for this claim. The Defendant's claims notwithstanding, this visit by Mr. Gallicchio was unusual and there did not seem to be any purpose to it with the exception of the purpose of confronting the Plaintiff as to his complaints about Mr. Geldof's conduct. (Exhibit L, pp. 35-36; Exhibit G, ¶ 11). At no time during this visit did Mr. Geldof and Mr. Gallichio talk to the staff or mention anything about the re-seating of the staff, nor did they look around or seem to be on a tour of the facility. (Salvatore Gozzo affidavit, attached hereto as Exhibit H, ¶ 3).[9]

Robert Moore has gone so far as to inform the Plaintiff that he was giving him a task to perform on account of his race. On several occasions, the Plaintiff was required to attend meetings in the predominantly minority North End of Hartford. (Luis Alvarado affidavit, attached hereto as Exhibit I, ¶ 9; Exhibit G, ¶ 14). The attendees of those meetings would shout, curse and accuse the Defendant of racial negligence and environmental injustice. (Exhibit I, ¶ 9). When meetings occurred in the majority white, non-Hispanic South End of Hartford, Geldof and Newton would eagerly attend those meetings. (Exhibit I, ¶ 7). A notable exception, however, was when there was a town council meeting in Wethersfield, and Robert Moore ordered the Plaintiff to attend the meeting solely to testify about projects in the predominantly Black/minority North End. (Exhibit G, ¶ 14). Those projects were claimed to be taking money away from the Wethersfield Cove projects. (Exhibit G, ¶ 14). By way of

---

[9]The Court should be advised that these three incidents involving Geldof are not the limit of his particularly outrageous conduct towards the Plaintiff. In fact, as the Defendant mentions in its memorandum, there was a prior CHRO complaint brought by the Plaintiff against the Defendant. That CHRO complaint related to discriminatory conduct by Geldof and others acting at his direction. (Exhibit G, ¶ 16).

explanation, Bob Moore stated that he was asking the Plaintiff to attend, because he "want[ed] to use [the Plaintiff] for [his] color." (Exhibit G, ¶ 14).

All of these facts taken together demonstrate the existence of a pattern of adverse treatment against the Plaintiff by upper management employees of the Defendant and even with the participation of the Chairman of the Board of the MDC. The Defendant's motion would have the court draw every inference in favor of the moving party: for example, "Any change in the management of the Engineering and Planning Department should be attributed to Mr. Moore's arrival, rather than the Plaintiff's involvement in the Harper case" (Defendant's Memo, p. 10). Here the Defendant does nothing short of invite the Court to ignore the burden of proof which is placed upon the moving party. The Court should not accept this invitation, but, instead, it should deny the Defendant's motion and allow a jury to determine the reasons behind the Defendant's treatment of the Plaintiff. The Plaintiff has established that there is sufficient evidence to support the required inference of discrimination, and, therefore, summary judgment in favor of the employer-Defendant is inappropriate. Mandell v. County of Suffolk, 316 F.3d 368, 374 (2d Cir. 2003).

## IV.    STATUTE OF LIMITATIONS

The Defendant's Motion for Summary Judgment raises the statute of limitations as to each of the causes of action alleged in the Complaint: 42 U.S.C. § 1983, 42 U.S.C. § 1981, and Title VII, 42 U.S.C. § 2000e. The Defendant argues that the Complaint contains allegations of discriminatory actions, which are beyond the reach of the respective statute of limitations for each cause of action. The Defendant's arguments in this regard fail to take into account the

fact that the present matter was brought within the time frame set by the statutes of limitations as to certain discriminatory actions that were merely portions of a continuous policy of discrimination on the part of the Defendant.

The holding of the Second Circuit Court of Appeals in <u>Association Against Discrimination in Employment, Inc. v. City of Bridgeport</u>, 647 F.2d 256 (2d Cir. 1981), cert. denied, 455 U.S. 988, 102 S. Ct. 1611, 71 L. Ed. 2d 847 (1982), is applicable to the various causes of action in the present matter. That case involved a class action brought on behalf of blacks and Hispanics challenging the civil service employment examination for a city fire department as violating Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq. <u>Id</u>. In that case, one of the defendants' principal challenges to the District Court's determination that the city was liable under Title VII was that the plaintiffs' claims were barred by the statute of limitations. <u>Id</u>., 274. The defendants argued that the plaintiffs' claims related to actions that occurred beyond the 300-day period of limitations set by Title VII. <u>Id</u>. The Second Circuit held "[w]here ... the defendant has engaged in a continuous policy of discrimination, acts in furtherance of that policy are not viewed in isolation. In such circumstances if the charge has been filed no later than 300 days after the <u>last</u> act by the defendant pursuant to its policy, the plaintiff may recover for earlier acts of discrimination as well." (Emphasis in original.) Id.

The doctrine described in <u>Association Against Discrimination in Employment, Inc. v. City of Bridgeport</u>, supra, 647 F.2d 256, has been applied not only in cases involving the Title VII 300-day limitation, but also to claims involving a three-year statute of limitations under 42

U.S.C. §§ 1983 and 1985. See <u>Velez v. City of New London</u>, 903 F. Supp. 286 (D. Conn. 1995) (denying motion to dismiss claims under 42 U.S.C. §§ 1983, 1985 and 1988 and Title VII on basis of "continuing violations" doctrine). In <u>Cornwell v. Robinson</u>, 23 F.3d 694 (2d Cir. 1994), the Second Circuit stated "When a plaintiff experiences a continuous practice and policy of discrimination, … the commencement of the statute of limitations period may be delayed until the last discriminatory act in furtherance of it." (Internal quotation marks omitted.) <u>Id.</u>, 703. "[A] continuing violation may be found where there is proof of specific ongoing discriminatory policies or practices, or where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." <u>Id.</u>, 704. See also <u>Allen v. Amalgamated Transit Union Local 788</u>, 554 F.2d 876, 880-81 (8th Cir.) (holding denial of seniority rights a continuing discriminatory act tolling statute of limitations), cert. denied, 434 U.S. 891, 98 S. Ct. 266, 54 L. Ed. 2d 176 (1977).

The continuing violations doctrine clearly is applicable to the present case, because there is proof of specific ongoing discriminatory policies or practices and of specific and related instances of discrimination permitted by the Defendant to continue unremedied for so long as to amount to a discriminatory policy or practice. Several of these related instances of discrimination are set forth in the Defendant's memorandum of law, although the Defendant would have the Court improperly draw the inferences from the facts in a light more favorable to the Defendant's position. For example, in the Local Rule 9 (c) 1 Statement and for purposes of the Motion for Summary Judgment, the Defendant recognizes that the following actions

occurred in the course of the Plaintiff's employment: "as a result of [the Plaintiff's] testimony [in Harper vs. MDC], he was subject to adverse treatment by several employees of the MDC.... Management initiated changes including: a. Sitting in on interviews Plaintiff conducted;  b. Overriding action Plaintiff took in regard to certain projects;  c. Holding meetings which Plaintiff was not invited to;  d. Overriding his decision concerning placement of personnel;  e. Reassigning work to other employees;  f. Excluding Plaintiff from meetings when he was previously involved in those matters; and  g. Calling Plaintiff the day of the jury verdict in Harper vs. MDC.... The Plaintiff attended a meeting where Cornelius Geldof, screamed at the Plaintiff, pointed his finger in plaintiff's face, and tore up papers.... After raising ... complaints, the Plaintiff was confronted [by] Geldof accompanied by the Chairman of the Metropolitan District Commission Gallicchio. At this meeting Geldof stated that Plaintiff was saying 'bad things about him', and that he should not be saying these things. Geldof also introduced Gallicchio to the Plaintiff.... The Plaintiff was not reclassified in his position, despite the addition of several large functions and responsibilities." (Defendant's Rule 9(c) 1 Statement, pp. 2-3).

The Defendant has also failed to inform the Court or the Plaintiff of those incidents described in the Complaint which the Defendant believes fall beyond the statutes of limitations. Therefore, the Plaintiff does not know which "allegations or incidents" the Defendant is asking the Court to dismiss. The Defendant has failed to carry its burden as the moving party, and, therefore, summary judgment should be denied.

## V. CONCLUSION

The Defendant has failed to satisfy its burden of demonstrating the absence of any genuine issues of material fact and that a judgment should enter in its favor. The Defendant's motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED,
PLAINTIFF, LEBERT THOMAS

By: _____
Robert W. Heagney (ct 5658) and
Stuart E. Brown, Esq. (ct 24659)
Hassett & George, P.C.
555 Franklin Avenue
Hartford, Connecticut 06114
(860) 296-2111

## CERTIFICATION

I hereby certify that a copy of the foregoing has been mailed this 11Th day of December, 2003 to the following counsel of record:

Anthony J. Palermino, Esq.
Law Offices of Anthony J. Palermino
945 Wethersfield Avenue
Hartford, CT 06114

Robert W. Heagney