UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| LEBERT THOMAS, | : | CIVIL ACTION NO. |
|     Plaintiff | : | 3:02 CV 457 (MRK) |
| | : | |
| v. | : | |
| | : | |
| THE METROPOLITAN DISTRICT | : | |
| COMMISSION, | : | |
|     Defendant | : | October 1, 2004 |

**PLAINTIFF'S MEMORANDUM
RE: LEVY & DRONEY REPORT**

The Plaintiff, LEBERT THOMAS, respectfully submits the following memorandum in accordance with the Court's Order at the trial management conference on September 22, 2004. The Court (Kravitz, J.) ordered that the parties submit simultaneous briefs as to the admissibility of a certain proposed exhibit: Plaintiff's Exhibit 26, the report of the compliance audit performed by Levy & Droney, P.C. (A copy of certain excerpts are attached hereto) The Plaintiff submits that the report is admissible pursuant to Federal Rule of Evidence 801(d)(2)(C) as an admission by party-opponent and, thus, should be admitted as evidence of the atmosphere condoned and, at times, fostered by the leadership of the Defendant, which encouraged the several incidents of retaliation and discrimination against the Plaintiff.

I.  **Compliance Audit an Admission by Party Opponent**

The report produced by Levy & Droney, P.C. is admissible as an admission by a party-opponent. The relevant rule of evidence in this instance is Rule 801(d)(2)(C) which

1

provides that: "A statement is not hearsay if … the statement is offered against a party and is … a statement by a person authorized by the party to make a statement concerning the subject…." The Plaintiff fully intends to offer the report against the Defendant. The only question for the Court is whether the report was a statement authorized by the Defendant so as to make it, in effect, an admission by the Defendant itself. The engagement letter from the Defendant to Levy & Droney, P.C., attached to the report, and the content of the report itself demonstrate that this report falls squarely within the category of admissions described by Rule 801(d)(2)(C).

The Defendant, Metropolitan District Commission ("MDC"), hired the law firm of Levy & Droney P.C. to "investigate the MDC's compliance with its existing policy not to discriminate against any employee because of race, ancestry, color, creed, national origin, sex, age, physical disability, union membership or activity. You will determine whether MDC is in compliance with its own discrimination policy as it relates to wages, hours and conditions of work. In doing so you shall review MDC promotional procedures, performance evaluation procedures, wage rates, position classification, and hiring procedures." (Exhibit 26, pp. 2-3, quoting letter from MDC counsel Bourke Spellacy). Levy & Droney, P.C. was not simply authorized to make statements in general about the employment policies of the MDC. In fact, this report was the result of an investigation specifically requested as to certain areas of the Defendant's business. Where the Defendant empowered Levy & Droney, P.C. to speak on the issues of compliance with, for example, discrimination policies, conditions of work, and position classifications, the Defendant

should not be allowed to prevent the introduction of the resulting report just because it does not paint the Defendant in as favorable a light as the Defendant might have desired.

The Plaintiff should be allowed to enter this report as an admission by the Defendant. Other federal courts have considered the issue of reports prepared at the request of a party in several different contexts and concluded that such reports were indeed admissible. See, e.g., United States v. Frazier, 53 F.3d 1105, 1109-1110 (10th Cir. 1995) (admitting audit report of accountant as business record); Michaels v. Michaels, 767 F.2d 1185, 1201 (7th Cir. 1985) (admitting statements by broker as admissions under FRE 801); United States v. Blackwell, 954 F. Supp. 944, 973-74 (D.N.J. 1997) (financial audit of bank admitted as business record); Rollins v. Board of Governors for Higher Educ., 761 F. Supp. 939, 942 (D.R.I. 1991) ("When an agent is employed to investigate and analyze an accident, such report is an admission of the principal.").

Although a number of cases have admitted such reports as business records, the Plaintiff asserts that the more applicable provision to the present case is the rule of authorized admissions set forth in Rule 801(d)(2)(C). See also United States v. Rioux, 97 F.3d 648 (2d Cir. 1996) (applying the rule of vicarious admissions in FRE 801(d)(2)(D) to statements by criminal defendant's agents). The Levy & Droney report was authorized to address a number of the issues, which go to the heart of the Plaintiff's treatment at the hands of senior employees of the Defendant. The Plaintiff calls the following passages to the Court's attention as examples relevant and admissible to the issues raised in his complaint:

- On page 13, the report notes the Defendant's "lack of an appropriate and effective mechanism to raise complaints concerning treatment and to have these complaints addressed by a neutral third party."
- Also on page 13, "[W]e did find an institutionalized incapacity or inability to timely or appropriately deal with issues of revaluation of job positions."[1]
- On page 18, "A second issue which must be addressed is the need for consistent practices in applying the policies and procedures of the MDC to its employees."
- On page 24, "[T]he Department of Human Resources did not work to review and update employment practices so that they complied with State and Federal laws."
- On page 25, "The Human Resources Department also does not have any non-retaliatory complaint and investigation policy concerning complaints of discriminatory or other unfair treatment."[2]
- On page 28, "A review of the existing Employee Handbook reveals it lacks basic information on such important issues as wages, benefits, work and discipline rules, Equal Employment, the Family and Medical Leave Act and other employment policies. It does not contain an updated Equal Employment Opportunity Statement covering all protected classifications of employees. It further fails to include a

---

[1] The report goes on to imply that problems with job revaluation are experienced by both Black and White employees, but the Plaintiff will offer proof that in his particular circumstance there is evidence of a similarly situated White employee who was treated differently in his job revaluation. The jury should be allowed to determine whether the inconsistent treatment of employees was motivated by reasons of racial animus or retaliation in the Plaintiff's case.

[2] This passage is particularly appropriate in light of Neil Geldof using then-Chairman of the MDC Board Gallichio to confront the Plaintiff after he raised a complaint about Geldof's threatening and abusive conduct.

complaint mechanism for complaints of sexual and/or other forms of alleged discriminatory treatment. It also does not include an ethics policy to be utilized by employees who raise complaints of inappropriate conduct in the workplace."

- Also on page 28, "The MDC has not sought to review or update its Affirmative Action Plan since 1997."

- On page 29, "There is no clearly defined anti-harassment policy prohibiting sexual and other forms of discriminatory treatment."

- On page 38, "We also saw the lack of consistency in the application of disciplinary practices."

These statements by the law firm authorized to make an evaluation and speak to these issues fall squarely within the rubric of Rule 801(d)(2)(C). They do nothing less than show a company which has ignored its duties to employees to create and follow consistent, appropriate employment practices. In such an atmosphere, the misconduct of the Plaintiff's supervisors in discriminating against the Plaintiff and retaliating against him were not unfortunate occurrences but, rather, inevitable results of the systematic neglect of the Defendant's management.

**II.    CONCLUSION**

For these reasons, the Plaintiff respectfully requests that the Court admit the Levy & Droney report as a full exhibit.

THE PLAINTIFF,
LEBERT THOMAS

By: _/s/ Stuart Brown_____
Robert W. Heagney (ct05858)
Stuart E. Brown (ct24659)
Hassett & George, P.C.
555 Franklin Avenue
Hartford, CT 06114
Phone: (860) 296-2111
Fax: (860) 296-8494

**CERTIFICATION**

This is to certify that a copy of the foregoing was sent via first class mail, postage prepaid this 1st day of October, 2004 to the following counsel of record:

James A. Wade
Robinson & Cole LLP
280 Trumbull Street
Hartford, CT 06103-3597

By: _/s/ Stuart Brown_____
Stuart E. Brown

\\Sbs2k\shared\Labor\Thomas, Lebert\Pleadings\Memorandum re Levy & Droney.doc




# LEVY & DRONEY, P.C.
### ATTORNEYS & COUNSELLORS AT LAW

## ATTORNEY-CLIENT PRIVILEGED COMMUNICATION

# COMPLIANCE AUDIT OF EMPLOYMENT PRACTICES

# OF THE METROPOLITAN DISTRICT COMMISSION

# UNDERTAKEN BY LEGAL COUNSEL




**MARCH 15, 2002**



Commissioner Marilyn Cohen
March 15, 2002
Page 2

communities, the Governor and the leaders of the General Assembly.

On October 1, 2001 some twenty (20) MDC employees complained to the MDC Board about "forms of race discrimination and/or retaliation" experienced by them as MDC employees. (A copy of the October 1, 2001 "charges sheet" is attached to this document as <u>Exhibit A</u>).

Thereafter, the MDC Board decided to employ outside counsel to perform a Compliance Audit.

MDC Counsel Bourke G. Spellacy of Updike, Kelly and Spellacy, P.C. then contacted the law firm of Levy & Droney, P.C. He spoke with Attorney John Rose, Jr. and Attorney John F. Droney concerning employing Levy & Droney, P.C. to act as attorneys for a special blue ribbon subcommittee of the MDC which was to conduct a Compliance Audit of Employment Practices. On October 24, 2001 Attorney Rose wrote to Attorney Spellacy setting forth, in a fee and representation letter, the nature of the firm's professional undertaking on behalf of the MDC. (See Rose letter attached hereto as <u>Exhibit B</u>).

On November 1, 2001, Commission Counsel Bourke G. Spellacy wrote to Attorney John Rose, Jr. of Levy & Droney, P.C. specifically hiring Rose and that firm to:

> investigate the MDC's compliance with its existing policy not to discriminate against any employee because of race, ancestry, color, creed, national origin, sex, age, physical disability, union membership or activity. You will determine whether MDC is in compliance with its own discrimination policy as it relates to wages, hours and conditions of work. In doing

> so you shall review MDC promotional procedures, performance evaluation procedures, wage rates, position classification, and hiring procedures. Your investigation shall encompass all District employees, management, union or nonunion and shall include all MDC locations . . .

(A copy of the Spellacy letter is attached as <u>Exhibit C</u>).

In addition to Attorneys John Rose, Jr. and John F. Droney, the Levy & Droney, P.C. firm assigned Lisa A. Zaccardelli, a principal experienced in employment discrimination work, to the MDC project.

On or about November 10, 2001, the MDC, acting by its Chairman Anthony H. Gallicchio, sent a letter to every employee of the Commission, to each Board member and to MDC counsel expressing the Commission's concern about the complaints of race discrimination, employment discrimination and retaliation. That letter (a copy of which is attached hereto as <u>Exhibit D</u>) announced the MDC Board's decision to hire Levy & Droney, P.C. to represent the Boards special Blue Ribbon Committee in conducting a Compliance Audit of Employment Practices. The letter urged the MDC employees and staff to cooperate with the attorneys and to treat the investigation as highly confidential.

The MDC had established a Blue Ribbon Committee to review compliance with state and federal law. That Committee has met with Attorneys Zaccardelli, Rose and Droney concerning the investigation and it will receive the report of Levy & Droney, P.C. as part and parcel of this Compliance Audit. The Blue Ribbon Committee

Commissioner Marilyn Cohen
March 15, 2002
Page 13

MDC before reaching the age of retirement. This leaves few opportunities for promotion. It is also, obviously, affected by outstanding hiring practices and the fact that there has traditionally not been a large number of people of color waiting in the wings for the retirement of their predecessors. **Second, and more significant, is the lack of an appropriate and effective mechanism to raise complaints concerning treatment and to have these complaints addressed by a neutral third party.** This leaves the employees with a perception that they have nowhere to turn but to arbitration or litigation. Third, while the policies themselves may be fair, the practical application of those policies may lead to complaints of unfair treatment. For example, we did find an institutionalized incapacity or inability to timely or appropriately deal with issues of revaluation of job positions. Long time frames were regularly experienced by Black and White employees seeking job revaluation, including people who had been doing the "new" job for long periods of time without being paid or otherwise rewarded. Senior managers complained of the same problem.

  B. **Personnel**

We begin with an analysis of the MDC's personnel, those staff and front-line employees who make up the vast majority of employees at the MDC. It is important to recognize that these employees are the driving force behind the MDC and that if it is to implement the goals of its Strategic Plan, the MDC can only do so by fully utilizing these employees. They, like the water the MDC supplies, are resources.

Commissioner Marilyn Cohen
March 15, 2002
Page 18

**Time and again employees reported frustration in not having an effective outlet to communicate their complaints.** Indeed, neither the employees nor the supervisors seem prepared or equipped to mediate disputes. For the employee this leaves only one outlet - the filing of a union grievance - or, worse, a formal complaint with the CHRO or other state or federal agency, leading to expensive adversarial proceedings.

**A second issue which must be addressed is the need for consistent practices in applying the policies and procedures of the MDC to its employees.** Employees who perceive unfair treatment point to such examples to argue they are being mistreated and that employment discrimination is the rationale. In conducting this Compliance Audit of the MDC's employment practices, we learned, from our interviews with employees, that the inconsistent application of policies and procedures has encouraged employees to address issues through litigation[13]. For example, the job revaluation process is conducted inconsistently leading to the problems of employees waiting long periods of time. In one particular instance, which is the current subject of litigation, the employee became frustrated with the length of time it took to review her job revaluation request. Although the union contracts define the period of time the MDC has to act on a job revaluation, these deadlines are loosely followed and were not enforced by the Manager in Human Resources. It is further

---

[13] We do note that the current Affirmative Action Officer has increased his role in this area by actively soliciting employees who have complaints to address those complaints with him for purposes of investigation.

Commissioner Marilyn Cohen
March 15, 2002
Page 24

Department was a department working for and with the organization of the MDC.

For approximately ten years, the Department of Human Resources was under the direction of a person who thought little of the employees or supervisors. She was described to us as the "Queen Bee". Because of her management style, no effort was made to work with the MDC's supervisors to understand the needs of the organization. It was reported that she told another management level person that he did not understand; that she ran the show - not him. Many managers and supervisors reported they had little to no dealings with Human Resources on such issues ranging from job postings to job reclassifications to discipline and pay issues. We consistently heard there was no effort made by Human Resources to communicate with supervisors. In addition, the Department of Human Resources did not work to review and update employment practices so that they complied with State and Federal laws. It does not appear that employees in Human Resources made any effort to continually educate themselves on changes involving employment laws. We were struck by the degree and extent of her ability to impose her will on some of the MDC's most powerful, long-term supervisors and managers.

The Human Resources Department also made little effort to be available to employees to handle disputes between managers and employees <u>before</u> the grievance process is initiated. For example, in interviewing the Manager of Labor Relations, he reported Human Resources received, on average, one complaint every six months, from an employee or supervisor. This is significant. **If the Department were**

Commissioner Marilyn Cohen
March 15, 2002
Page 25

**perceived as a means to voice complaints, and <u>resolve</u> disputes, then it seems likely employees and supervisors would report issues on a far more consistent basis.**[14]

**The Human Resources Department also does not have any non-retaliatory complaint and investigation policy concerning complaints of discriminatory or other unfair treatment.** Good complaint investigation policies include (1) prompt action to interview both the complainant and the accused; (2) a thorough investigation including gathering of any and all witness statements to the alleged event; (3) appropriate documentation of the investigation; (4) communication of the investigation results. What we discovered is that if an investigation takes place at all, it rarely includes acquiring a statement from the individual accused of the improper conduct until the investigation is complete and disciplinary action is decided. The nature of this process leads to a perception of unfair and skewed results and in altogether too many instances, to adversary actions.

We found that the current Director of Human Resources is working to remove these barriers and create a department geared towards improving the relationship of Human Resources, its staff and supervisors with other MDC departments. The Chief Operating Officer reported for example that he has worked well with the Acting Director and seen the implementation of positive changes.

---

[14] We understand the union process is routinely utilized to resolve issues.

Resources Department, reported back that the employees received the Union contract[16].

A review of the existing Employee Handbook reveals it lacks basic information on such important issues as wages, benefits, work and discipline rules, Equal Employment, the Family and Medical Leave Act and other employment policies[17]. It does not contain an updated Equal Employment Opportunity Statement covering all protected classifications of employees. It further fails to include a complaint mechanism for complaints of sexual and/or other forms of alleged discriminatory treatment. It also does not include an ethics policy to be utilized by employees who raise complaints of inappropriate conduct in the workplace.

### 2. Affirmative Action Plan

**Also absent from the MDC's policy documentation is an updated Affirmative Action Plan.** The first MDC Affirmative Action Plan we were able to locate is dated 1996. The MDC has not sought to review or update its Affirmative Action Plan since 1997. It further has not utilized Affirmative Action goals in reviewing hiring and/or promotional practices. Other than having an outdated policy, the District has done little to ensure Affirmative Action goals are in keeping with the organization's legal obligations. Recall the MDC is, for purposes of the law a

---

[16] As of this writing, we were presented with a draft employee handbook, which at the Acting Director's direction, was prepared. There are, however, certain elements missing from this document.

[17] For example, although the document refers to certain policies, these are not included in the Employee Handbook. These include the Family and Medical Leave Act, Employee Conduct, Performance Management and other policies which should be included.

Commissioner Marilyn Cohen
March 15, 2002
Page 29

"municipality". This is significant. An Affirmative Action Policy, updated and correct, which includes the goals for the corporation provides a benchmark for reviewing hiring, retention and promotion practices of protected classes.

The recent hiring of an Affirmative Action Officer with no clearly defined role in the organization, does not eliminate the need for a Plan which can be supervised by the Affirmative Action Officer. He must interact with staff and supervisors. We met few employees who had met the Affirmative Action Officer or understood his role. As matters currently stand, the Affirmative Action Officer has been provided with little guidance as to what his duties are and has met with some resistance concerning his authority in the organization and the scope of his involvement in practices heretofore reserved to personnel in the Human Resources area.

3. **Equal Employment Opportunity and Discrimination Policies and Practices**

**There is no clearly defined anti-harassment policy prohibiting sexual and other forms of discriminatory treatment.** The need to have appropriate complaint mechanisms to raise complaints of such discrimination is critical in providing claims and defending lawsuits based upon allegations of violations of Title VII of the Civil Rights Act and/or Connecticut General Statutes Section 46a-60 *et seq*. The Supreme Court decision of Ellerth v. Burlington Industries, 524 U.S. 742 (1998) provides for an affirmative defense to claims of discriminatory, harassing hostile work environment where the employer is able to establish that (1) the employer exercised reasonable care to prevent and promptly correct sexually harassing behavior; and (2) the employee

Commissioner Marilyn Cohen
March 15, 2002
Page 38

in over ten years. The Acting Director of Human Resources reported that a primary motivation for the performance based review system she has recently developed. (A copy of said Proposal is attached hereto as <u>Exhibit J</u>) was the finding that many managers, and in particular two in the Engineering Department, had not received, other than cost of living increases, any raises in years. Another employee, a supervisor in the Finance Department, had also not received any form of a raise in several years. **The performance review system, therefore encourages average performance on the part of employees.**

This holds equally true for those employees who are members of the three Unions. Once an employee reaches the top of his/her job classification, there are no further opportunities for raises beyond cost of living adjustments. **We endorse the notion advanced by several managers and supervisors that would provide appropriate incentives to dedicated, top performers.**

H.   <u>Discipline Policies and Procedures</u>

**We also saw the lack of consistency in the application of disciplinary practices.** While the MDC's union contracts do dictate a form of progressive discipline, which in some ways places certain constraints on the disciplinary process, the MDC has not permitted its supervisors to discipline its employees according to a uniform disciplinary policy.[21] Consistent training on how to discipline employees eliminates perceptions of unfairness which impact

---

[21] The Acting Director of Human Resources has worked with supervisors and involved them in disciplining the employee.

# Updike, Kelly & Spellacy, P.C.

Counselors at Law

Hartford • New Haven • Stamford

Independent Member of
Commercial Law Affiliates

Bourke G. Spellacy
(860) 548-2602
bspellacy@uks.com

One State Street, P.O. Box 231277
Hartford, Connecticut 06123-1277
Telephone (860) 548-2600
Facsimile (860) 548-2680

November 1, 2001

John Rose, Jr., Esq.
Levy & Droney, P.C.
74 Batterson Park Road
Farmington, CT 06032

Re:  Independent Investigation

Dear John:

    About twenty MDC employees have recently complained to the MDC Board about experienced or observed racial discrimination and/or retaliation. Additionally, commissioners have been informed that MDC staff morale is low and/or that other issues of unfairness, favoritism, and similar problems exist within the MDC work force. Litigation is pending or anticipated based on the above claims including a possible class action suit.

    The MDC Board has asked me to engage counsel to conduct an independent investigation of the issues previously outlined and to report to me. A special committee will be created by the Board to oversee the process. You may expect to be asked by me to attend committee meetings and perhaps a meeting of the Board.

    You should investigate MDC's compliance with its existing policy not to discriminate against any employee because of race, ancestry, color, creed, national origin, sex, age, physical disability, union membership or activity. You will determine whether MDC is in compliance with its non discrimination policy as it relates to wages, hours and conditions of work. In doing so, you shall review MDC promotional procedures, job bidding and posting procedures, performance evaluation procedures, wage rates, position classification, and hiring procedures. Your investigation shall encompass all District employees, management, union or non union and shall include all MDC locations.

    You should pay particular attention to MDC compliance policies as they may affect pending or anticipated legal claims.

260043

John Rose, Jr., Esq.
Page 2
November 1, 2001

You will lead the investigation with assistance by John Droney and Lisa Zaccardelli. Your firm will be paid at a blended rate of $300 per hour plus approved expenses. Billing should be monthly.

I appreciate your willingness to undertake this task. I suggest that you commence with interviews of Trude Mero and Paul Ritter. Both commissioners have insights into the issues raised by the employees. On pending cases, Tony Palermino is familiar with the facts and will be available to you as needed.

Sincerely,

Bourke G. Spellacy

BGS/cmb